```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

UNITED STATES OF AMERICA,         )
                                  )
         Plaintiff,               )
                                  )
    v.                            )    No. 4:07 CR 487 CEJ
                                  )                    DDN
DAVID E. WISE,                    )
                                  )
         Defendant.               )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 7 and 11, 2008. After the hearing the court granted the parties' request for leave to file post-hearing memoranda. The final brief was filed on January 28, 2008.

Defendant David E. Wise has moved to suppress evidence and statements (Doc. 32) and to suppress confessions (Doc. 38). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

1. On July 13, 2007, Berkeley, Missouri, Police Detective Josh Davis of the North County Municipal Enforcement Group (MEG) Unit received information from a confidential informant (CI) that there was a marijuana growing operation at 15718 Hill House Road, operated by Brian Sievers and David Wise.

2. On July 16, 2007, shortly before 2:30 p.m., Det. Davis and MEG Unit Dets. Jeffrey Seerey and John Cochran went to 15718 Hill House Road, in Chesterfield, Missouri, to do a "knock and talk" interview[1] with Brian Sievers who resided there. The officers identified

---

[1] In a "knock and talk" interview, the police endeavor to speak with someone in manner or in circumstances that do not implicate the subject's constitutional rights.

themselves as police.  Det. Davis told Sievers about the information they had received.  Sievers appeared upset and said, "Who ratted me out?  That's all I want to know."  Sievers told the officers he had more than 100 plants downstairs.  Det. Davis then advised Sievers of his <u>Miranda</u> rights and presented him with a Consent to Search form, Government Exhibit A.  Sievers signed the form expressly stating that he had been advised of his right to refuse permission to search, and that without any threats or promise he freely and voluntarily gave the officers his consent to search his home.  (Gov. Ex. A.)

     3.    The detectives searched the whole house and recovered 312 marijuana plants, two guns, extension cords, grow lights, power converters, scales, baggies, and an irrigation system.  After the search, Sievers told Det. Davis that his house was solely used as a grow house, and that he did not know the exact number of plants because he did not take care of them.  Sievers told Det. Davis that David Wise, who lived on Wiggens Ferry Drive, took care of the plants.

     4.    The police, dressed in plain clothes, and Sievers drove to 721B Wiggens Ferry Drive, in Creve Coeur, in several vehicles, arriving at approximately 2:30 p.m.  Sievers rode with Det. Davis and pointed out Wise's apartment.  Det. Davis parked his police vehicle on the north side of the apartment building.  Davis and Sievers remained in their car, while Dets. Seerey and Cochran left their vehicle to try a "knock and talk" with David Wise.  As they approached Wise's apartment, Det. Seerey saw Wise walk into his apartment.  When the officers arrived at the door, it was open a couple of inches.  Seerey knocked as Wise was on his way back out.  The detectives identified themselves as police officers and asked Wise whether they could speak with him about "the situation in Chesterfield."[2]  Det. Seerey asked Wise if he would rather

---

[2] Wise testified that the officers did not announce themselves as law enforcement.  Defendant's wife, Brooke Center, testified that the officers did not knock, nor did they identify themselves as law enforcement.  According to Center, one of them asked, "Do you have any idea why narcotics officers would be in your apartment?" which led Center to believe they were police officers.

talk inside or outside the apartment. Wise said he preferred to speak inside and he led the two officers into the apartment.[3]

    5. Inside the apartment was Wise's wife, Brooke Center, and their three-year-old daughter. In the front room, Det. Seerey started to state why the officers were there and asked Wise whether he wanted to discuss the matter in front of his wife and child. Wise said, "No," and led the detectives to the back bedroom, approximately ten feet away down a hall.[4]

    6. In the bedroom, Det. Seerey saw that Wise appeared nervous, so he patted him down. The officer found no weapon, but, upon observing a bulge in Wise's clothing, Det. Seerey asked Wise about the object; Wise said it was marijuana for his personal use. Seerey directed Wise to remove the object and place it on the dresser. Wise did so. The pouch was open enough for the officer to see marijuana and a pipe inside. Wise said it was marijuana for his own personal use.[5] Det. Seerey then explained to Wise why the officers were at his apartment, that they had been at the house in Chesterfield where they recovered a large marijuana growing operation in which several hundred plants were seized, and that Wise's friend Brian Sievers, who was in custody, said that Wise was the one responsible for growing the marijuana. Wise indicated he did not believe this information. At that point, about five minutes after the officers had entered the apartment, Det. Seerey

---

[3] Det. Seerey's testimony is the same as Det. Cochran's as to this point. Wise testified that he asked the officers to speak with him outside the apartment. It is the detectives' testimony that at this point they were invited inside, whereas Wise contends they were not. The undersigned credits the testimony of the officers on this issue.

[4] Center testified that Wise was seated behind her at their dining room table and that the decision to go to the back bedroom was the detectives' and not her husband's. Wise and Center both testified that Wise was handcuffed immediately upon Wise re-entering the apartment with the detectives. Neither Det. Seerey nor Det. Cochran could recall if Wise was ever handcuffed. Det. Davis clearly testified that he handcuffed Wise later in the bedroom. The undersigned credits the testimony of Det. Davis on this issue.

[5] Wise and Center both testified that Wise's person was "searched" in the front room, before Wise and the detectives moved to the back bedroom. The undersigned credits Det. Seerey on this issue.

used his Nextel phone to call and have Det. Davis bring Sievers inside the apartment.

      7.    Det. Davis, wearing plain clothes and a police badge on a chain around his neck, brought Brian Sievers inside the apartment. At this time Ms. Center was seated in the front room. Davis and Sievers went to the rear bedroom. When Det. Davis brought Sievers into the bedroom, Det. Seerey told them that Wise was not understanding "the big picture" and that they would have to tell Wise what was going on. Det. Seerey then left the bedroom to stay with Wise's wife and daughter and Det. Davis took over interviewing Wise. Wise's wife and child had become noticeably upset in the front room. Sievers told Wise that the police had caught them and that "it was over." Det. Davis then advised Wise of his Miranda rights by reading them to him from a Miranda card.[6]

      8.    Then Det. Davis asked Wise if he would cooperate. Wise answered in the affirmative. Davis then asked Wise questions which Wise answered.[7] Det. Davis then seized the marijuana pouch Wise had placed on the dresser and also seized marijuana seeds he saw on the dresser.[8]

---

[6]Center testified that she never heard Det. Davis give Wise his Miranda rights. Wise also testified that he was never read his Miranda rights. Det. Seerey testified that he never heard anyone read Wise his Miranda rights. Det. Cochran testified that he was in the doorway to the bedroom when Davis read Wise his Miranda rights. Sievers, who was always in the back bedroom, could not recall whether Wise was read his Miranda rights. The undersigned credits Det. Davis's testimony that he read Wise his rights.

[7]Wise testified that Davis questioned him, but he did not answer the questions.

[8]Both Wise and Center testified that they had no knowledge of marijuana seeds in the apartment or being found in the apartment.

Det. Davis handcuffed Wise and searched the apartment.[9] [10] Wise told the police he wanted to cooperate and become a CI.[11] Because of that, Davis released Wise from his handcuffs and gave him his calling card. The officers also uncuffed Brian Sievers. After being in the apartment a total of approximately 25 minutes, the officers left the apartment, leaving Sievers and Wise in the apartment. Wise drove Sievers back to his residence.

## DISCUSSION
### A.  Fourth Amendment Issues
**Seizure of Items from Sievers's Residence**

The Fourth Amendment to the Constitution protects an individual from unreasonable searches and seizures. U.S. Const. amend. IV. The protections of the Fourth Amendment generally prohibit the police from entering a home without a warrant, unless the circumstances fit an established exception. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Varner, 481 F.3d 569, 571 (8th Cir. 2007). Voluntary consent provides one such exception. Rodriguez, 497 U.S. at 181.

In this case, Sievers signed a consent to search form, authorizing a search of his residence. (Gov. Ex. A.) In signing the form, Sievers stated that his consent was free and voluntary, and was not induced by

---

[9] Wise was the only one to testify about a safe that he claimed he was forced to open. At first Wise indicated that all three detectives forced him to the ground and uncuffed him. Then he stated that he was forced to open the safe with his handcuffs still on, requiring him to look behind him to open the safe. No evidence indicated that anything was seized from any such safe.

[10] The government has not indicated that it intends to use any other physical evidence seized from inside the apartment, other than the pouch (with marijuana and pipe) and the seeds. However, Wise testified that the police seized from inside a dresser drawer a set of brass knuckles and a paper weight. The undersigned considers the propriety of the seizure of these last two items to be moot, if they were in fact seized.

[11] Wise testified that Davis and Sievers were in the back bedroom with Wise for about ten minutes. The detectives wanted Sievers and Wise to become informants for them. Wise says he refused. The undersigned credits the officer's testimony that Wise agreed to cooperate.

- 5 -

threats or promises. Under Rodriquez, with Sievers's voluntary consent, the officers lawfully seized the items from Sievers's residence.

**Entry into Defendant's Apartment**

As noted above, the prohibition against unreasonable searches and seizures does not apply where voluntary consent to search has been given. Rodriquez, 497 U.S. at 181. In this case, Wise said he preferred to speak with the officers inside his apartment and then led the officers inside. Thus, the officers' warrantless entry into the apartment was justified under the Fourth Amendment by Wise's voluntary consent.

**Seizure of the Pouch and the Marijuana Seeds**

An officer's reasonable fear of harm justifies a brief seizure and pat-down of a suspect. United States v. Ellis, 501 F.3d 958, 961 (8th Cir. 2007) (citing Terry v. Ohio, 392 U.S. 1, 29 (1968)). To be constitutionally reasonable, the pat-down or protective frisk must be based upon a reasonable suspicion that criminal activity is afoot. Id. "A protective frisk is only warranted if specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." Id. In deciding whether the facts amount to a reasonable suspicion, the court looks to the totality of the circumstances known to the officer, and views the facts from an objective standpoint. Id. The justification for a protective pat-down may occur after the beginning of either an investigative stop or a consensual encounter. Id.

A suspect's nervous appearance or nervous movements, coupled with other facts or circumstances, will support an officer's protective pat-down. Id. at 962; United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000). In Ellis, the officer conducted a protective pat-down after the suspect appeared nervous, fidgeted, moved his hand near his pocket, and attempted to leave a residence known for drug sales. Ellis, 501 F.3d at 959-60. In Davis, the officer conducted a protective pat-down after the suspect was seen entering a complex known for drug sales, moved nervously, and adjusted his jacket. Davis, 202 F.3d at 1061. In each

case, the Eighth Circuit Court of Appeals found the officers' conduct was reasonable. Ellis, 501 F.3d at 962; Id. at 1063.

In this case, Det. Seerey noticed that Wise appeared nervous. Det. Seerey was investigating Wise in connection with a large marijuana growing operation. See United States v. Cash, 378 F.3d 745, 748-49 (8th Cir. 2004) ("[T]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious."). Before arriving at Wise's residence, officers had uncovered 312 marijuana plants and two guns from a co-defendant's residence. See United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997) ("[W]eapons and violence are frequently associated with drug transactions."); see also United States v. Koonce, 884 F.2d 349, 354 n.8 (8th Cir. 1989) ("[F]irearms are tools of the drug dealer's trade."). Given the strong connection between drugs and guns, coupled with Wise's nervous appearance, Det. Seerey acted reasonably in patting down Wise for weapons. Then, after observing a bulge in Wise's clothing, the officer acted reasonably in directing Wise to remove from his clothing the object that caused the bulge.

After Wise removed the pouch from his clothing, Det. Seerey noticed marijuana and drugs inside the pouch. Det. Davis lawfully seized the pouch as well as marijuana seeds he saw on the dresser. Under the plain view exception, an officer may seize an object, in plain view, without a warrant, if the officer is viewing the object from a lawful position, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object. Varner, 481 F.3d at 572. As noted above, the officers had entered the residence lawfully, had lawfully asked Wise to remove the pouch, and then observed marijuana within the pouch. Det. Davis also observed marijuana seeds on the dresser. Under the plain view exception, the officers lawfully seized the marijuana seeds and the pouch containing marijuana and a pipe.

### B. Fifth Amendment Issues

Defendant Wise seeks the suppression of all of his statements on July 16, because they were elicited from him without him having been advised of his constitutional rights to remain silent and to counsel,

as required by Miranda v. Arizona, 384 U.S. 436 (1966), and because his statements were involuntary.[12]

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the rights to remain silent and to counsel. Miranda, 384 U.S. at 444. The safeguards described in Miranda only apply when a suspect is in custody. Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). Statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. United States v. Briones, 390 F.3d 610, 614 (8th Cir. 2004).

In this case, Wise answered Det. Davis's questions after being read his Miranda rights. These responses constituted a waiver of his rights. See North Carolina v. Butler, 441 U.S. 369, 372-76 (1979). Prior to his making these statements and when he made them, Wise was not the subject of any duress, coercion, or threat of punishment. His statements were made voluntarily and responsively, and were not induced by any improper government action. See United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). Accordingly, Wise's statements to the officer after he was read his Miranda rights may be used against him without violating his Fifth Amendment rights.

Wise argues that United States v. Gonzalez-Lauzan, 437 F.3d 1128 (11th Cir. 2006), cert. denied, 127 S. Ct. 146 (2006), and Florida v. Shuttlesworth, 927 So.2d 975 (Fla. Dist. Ct. App. 2006), require the suppression of his statements. In Gonzalez-Lauzan, officers interviewed a prisoner, who was incarcerated for a matter different from their investigation. Gonzalez-Lauzan, 437 F.3d at 1130-32. They decided that, before they asked him any questions, they would describe the facts they knew, indicating that they had a strong case against him, and then,

---

[12]In its post-hearing memorandum, counsel for the government indicated that the government does not intend to use any statement Wise made before he was read his Miranda rights. (Doc. 53 at 7.)

if he appeared interested in making statements, they would then give him his Miranda rights.  Id.  During the early part of the interview they told the prisoner, several times, that they were not asking him any questions and that they did not want him to make any statement.  Id.  Nevertheless, occasionally the prisoner made short statements and at the end of the officers' two and a half hour presentation, he said, "Okay, you got me."  Id.  At that point the officers gave the subject his Miranda rights.  Id.  In that case, the Magistrate Judge found that the pre-Miranda presentation was the functional equivalent of interrogation under Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980), and recommended suppression.  Id.  The District Judge adopted the recommendation and suppressed the pre-Miranda statements.  Id.

On appeal, the Eleventh Circuit discussed the issue of the admissibility of statements made after "midstream" Miranda warnings. Id. at 1132-36.  After surveying relevant case law, the court of appeals determined that, depending upon the record, "where officers in a calculated manner first obtained incriminating statements from a suspect, and then used those incriminating statements in the warned interrogation in order to undermine the midstream Miranda warnings," the post-Miranda statements ought to be suppressed.  Id. at 1136.  The court considered five relevant factors described by the Supreme Court in Missouri v. Seibert, 542 U.S. 600, 615 (2004):

> (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 1135.  The court in Gonzalez-Lauzan, affirmed the conviction after determining from the record that before the Miranda rights were given the officers asked the defendant no questions and cautioned him to not make any statements.  Id. at 1138.  Therefore, the Miranda warnings given by the officers were deemed effective for the post-Miranda statements.  Id.

In Wise's case, the five Seibert factors militate against a determination that Det. Davis's Miranda warnings were ineffective for

- 9 -

the subsequent statements Wise made. First, assuming Wise was in custody for Miranda purposes (which the undersigned does not find) at any time before the Miranda warnings were given, the officers did not ask Wise any questions. Before issuing the Miranda warnings, Det. Seerey was merely explaining to Wise the nature of the investigation and how the investigation had come to focus on Wise. Wise indicated he did not believe this information, but was not responding to any specific questioning. See Gonzalez-Lauzan, 437 F.3d at 1138 (where suspect was asked no questions and gave no answers before receiving Miranda warnings, the first Seibert factor strongly suggests that the warnings were effective). Second, Wise's statements before the warnings were unrelated to his statements after the warnings. Before being Mirandized, Wise stated he did not believe the officer's account of the investigation. After being Mirandized, Wise stated he would be willing to cooperate and answered other related questions. The third factor favors Wise, since very little time passed between the pre-warning and post-warning statements. The fourth factor, however, favors the government. Det. Seerey explained the nature of the investigation, while Det. Davis advised Wise of his Miranda warnings and questioned him afterwards. The same officer was therefore not involved with both sets of statements. Finally, the post-Miranda statements, elicited by another officer, did not represent a natural continuation of Wise's pre-Miranda statements.

In Seibert the Supreme Court was concerned with whether the officers' conduct undermined the Miranda warnings to the point where the warnings could no longer function effectively. Seibert, 542 U.S. at 611-12, 616. Looking to the five factors, the officers' conduct in this case was not the type of conduct that would have effectively eroded the purpose and meaning of the Miranda warnings. As in Gonzalez-Lauzan, the undersigned concludes that the midstream Miranda warnings were not ineffective.

Wise also points to the Shuttleworth opinion. In Shuttleworth, the Florida appellate court determined that the officers should have given the suspect her Miranda warnings at an earlier point in the investigation. Shuttleworth, 927 So. 2d at 978. The court was

concerned with the timing of the <u>Miranda</u> warnings, but not their effectiveness.  <u>See</u> <u>id.</u>  In this case, the timing of the <u>Miranda</u> warnings is not an issue.  <u>Shuttleworth</u> is therefore distinguishable.

Whereupon,

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress evidence and statements (Doc. 32) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant to suppress confessions (Doc. 38) be denied.

The parties are advised they have until close of business March 4, 2008, to file written objections to this Report and Recommendation.  The failure to file objections may result in a waiver of the right to appeal issues of fact.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 19, 2008.